Next case is Amneal Pharmaceuticals v. Endo Pharmaceuticals, 2016-12-17. Ms. Jolie. Good morning. May it please the court. I'm Brenda Jolie on behalf of Appellant Amneal Pharmaceuticals. As this court stated in the Cal case, claimed subject matter is not presumed to change as a function of how one elects to measure it. The patent trial and appeal board overlooked this crucial point and failed to recognize the prima facie case of obviousness presented by the prior art Oshlak patent. Well, your citation to In re Cal was incomplete, wasn't it? I mean, the sentences that follow the sentence that you quote has completely explains the context of that. Right? I think this was a crucial point and I think the follow up doesn't change the crucial point in this context, especially as applied to the Oshlak patent, which was not being considered in that opinion. Well, what about the board's finding that, in fact, there was submitted abundant medical evidence that, in fact, there is a difference based on the measurement mechanism? I don't think that is a dispositive fact finding of the actual relevant legal question. The only thing that the board found was that the two methods don't have a specific mathematical correlation or are not exactly equivalent. But that does not answer the question of whether the formulation was obvious. And a key point to keep in mind in that regard is that there isn't a specific dissolution profile claim. There are broad ranges recited. And at most, all that Amnil would have to show is that those ranges overlap at least slightly. And a finding that they are not exactly equivalent is not a finding that they would not at least overlap slightly by a preponderance of the evidence. The PTAB erred as a matter of law because it failed to apply the appropriate standard for obviousness and placed an undue burden on Amnil. It wasn't Amnil's burden to prove a specific mathematical correlation between the dissolution measurements made by the alternate USP approved dissolution methods. Amnil met its burden to prove that the claims were obvious by showing that prior art would motivate or teach a person of ordinary skill in the art how to arrive at the claimed subject matter with a reasonable expectation of success. But I mean, as the portion of In Re Cal that you don't cite makes clear, that what is important is whether the skilled artisan would have been prompted by the prior art, whether what they would be prompted to do is, in fact, within the scope of the pending claim. And you didn't show an overlap. First of all, I'd like to point out that these are functional claim limitations, not structural limitations. And while functional claiming is not per se wrong, as longstanding precedent from this court, like the Swinehart and Schreiber cases cited in the briefing show, when a functional limitation lies at the alleged point of novelty, a patent applicant was always supposed to bear the burden to produce evidence establishing that the structurally similar prior art subject matter would not contain the same functional characteristic in order to refute a prima facie case of unpatentability. Otherwise, patents could be obtained simply by reciting a property not explicitly disclosed in the prior art or not explicitly disclosed by the exact measurement method that the PTO lacks the ability to test to disprove. The claimed same subject matter is presumed to not change. And indeed, OSHLAC is presumed enabled as a matter of law. So presumptively, the difference in the recited measurement method, which is the only difference between the OSHLAC claims and the 216 claims. Was there any debate below whether OSHLAC was enabled? I didn't really understand that argument that you were making. There wasn't really debate about that, but the point of that being. Why did you go to such length in your brief to argue about that the board was unfair in putting a burden on you to show that OSHLAC was enabled? Because OSHLAC is presumed enabled as a matter of law, and it claims controlled release oxymorphone formulations effective over at least 12 hours, which is the same thing that ENDO was claiming here. So what that means is presumptively the difference in the recited measurement methods, which is again the only difference, does not change a person of ordinary skill in the arts ability to achieve controlled release oxymorphone formulations effective for at least 12 hours. By issuing the OSHLAC claims, that's what the PTO found, is that one of skill in the art would be able to achieve controlled release oxymorphone formulations effective for 12 hours by following the dissolution profile recited in OSHLAC. Reciting in patent claims physiological properties that result from administering an obvious formulation also does not make the formulation patentable. That's not invention. It's just observation. And the Patent Trial and Appeal Board also placed an incorrect burden here on Amnil in requiring it to prove that one of those pharmacokinetic limitations regarding the multiple peaks are found in every immediate release formulation of oxymorphone. That's not really what they said. You make that argument that they said you have to show that it shows up everywhere, but that's not really what they said. Well, their fact finding was that Amnil had not presented sufficient evidence to show multiple peaks in every formulation of oxymorphone. And what they were referring to is that they hadn't shown it in every single immediate release formulation shown in the patent. But that wasn't Endo's burden. And in fact, it was undisputed that at least some of the immediate release formulations showed it. If you're trying to show that something's inherent, and I'm not even sure why this inherency even applies in these circumstances, but doesn't inherency mean that it necessarily follows? But here the only thing that would have to necessarily follow is that it is necessary in the controlled release formulations of oxymorphone. Even if it's not inherent to all immediate release formulations. Would you be the one who put this evidence forward? We did put the evidence forward that it was shown in at least some immediate release formulations, and the evidence was there to show that. And in fact, the fact that it is undisputedly shown, even in the patent data that's presented for some of the immediate release formulations, shows that it's not related to just certain controlled release formulations. It's not related to certain controlled release excipients. It is related to the active pharmaceutical oxymorphone itself. But you argued below that it would be inherent in all release formulations, did you not? We made an argument that it is inherent to the drug itself, but we also said at the least it is inherent to all controlled release formulations. And that is the only burden that we actually had to meet. And in fact, ENDO itself, in the prosecution history, stated that it is inherent to all controlled release formulations. And therefore, based on the doctrines of prosecution history and judicial estoppel, they shouldn't even be able to dispute that it is inherent to the controlled release formulations of the prior art. And where did you argue the prosecution history argument below? It was cited in the petition, in the original petition. But that only related to the nexus prong as it relates to the objective indicia, right? No, it was not cited just in relation to the secondary considerations. It was also cited in discussing the prima facie case based on Oshlak itself. Where? What's the site? In appendix 97. I'm sorry, wait, that's the wrong site. Maybe you could cite it on rebuttal. I can find that on rebuttal. Anything further? Yes. I just want to point out that all of the evidence presented in the IPR was consistent with multiple peaks being inherent to at least the controlled release formulations taught by the prior art. The only fact found by the Patent, Trial, and Appeal Board that Amnil didn't present evidence sufficient to show it in every immediate release formulation doesn't answer the relevant legal question. As I pointed out before, the fact that you see it in at least some of the data in the patent itself on some of the immediate release formulations shows that it's not related to certain excipients. And as was explained in the evidence presented in the IPR, just because you couldn't see it in the certain data that was shown in the patent from certain studies doesn't mean that it wouldn't be present in all other immediate release formulations if the correct data were collected. The problem is those studies were never designed to be looking for or presenting evidence of multiple peaks. But of course it's your burden. It's our burden to show that it is inherent to controlled release formulations. We didn't have to show that we had the data to show it in every immediate release formulation. That wasn't our burden. And even Endo's expert admitted that there was no reason to think multiple peaks wouldn't be found in all controlled release oxymorphone formulations. The only thing she said is that you haven't shown the data to show it in every immediate release formulation. She never said that it would not be present in all controlled release formulations. So we met our burden regarding the controlled release formulations. And Endo should be stopped from asserting otherwise anyway based on their prosecution history statements. And with that I'll reserve the rest of my time. We will save it for you. Mr. Mahoney. Good morning and may it please the court. Can you start where she left off? Let's do multiple peaks first. The multiple peaks. Sure, Your Honor. Sorry to throw you off your schedule. But what is your response to this notion that as long as they proved that it would be inherent in controlled release, assuming they did, that that would be enough? It is not enough. And indeed, they did not establish that there are multiple peaks present in a controlled release oxymorphone formulation. As I think you pointed out, in their petition, the evidence that they put forward was directed to the inherency questions around immediate release formulations. So that's what we responded to in our patent owner response. And that was what was part of the trial. And there was no evidence put forward with respect to inherency related to controlled release oxymorphone. Is there anything that your expert said that you think would lend support to the argument that they're making? All she said, Your Honor, was that she wasn't sure and that that was possible. She had no data in front of her. I believe that she focused on the question of whether there were data in the record, whether there was data put forward in front of her to say one way or the other. And I think that she could not exclude the possibility that multiple peaks would be present in a controlled release formulation. In fact, there are multiple peaks with the APANA ER formulation, which is the commercial embodiment covered by the claims. So she said you'd have to look at it on a case-by-case basis. You would. You would have to look at it on a case-by-case basis, Your Honor. What about the prosecution history argument, putting aside the waiver issue? Well, first of all, that was not considered below. It was not put forward as an argument. It is a new argument. Our position is that they waived it. But the prosecution history does not change the outcome of this case. Their focus on the prosecution history, they claim that ENDO admitted during prosecution that all controlled release oxymorphone formulations, regardless of excipients, would exhibit multiple peaks. And that's not what we said. And what they rely on is a declaration by Stanford professor David Yeomans, which is at A604 to 612. And in his declaration, he is analyzing whether there are peaks present with respect to APANA ER. Again, a very specific formulation that, yes, it's covered by the claims, but in no way did Dr. Yeomans state in his declaration that any and all oxymorphone controlled release would provide those peaks. So, again, we think it's a new argument that should not be considered, but even if it were, it would not change the outcome of the case because it's not an admission. With respect to the enablement question, I would like to respond to that as well. I think, as you certainly know, enablement is not inherency. There's not an equation of the Oshlak patent and the fact that it may be presumed enable for what it states because it was issued by the PTO. That does not equate to whether it inherently teaches the equivalence between the basket dissolution method at 100 RPMs and paddle at 50. Was there even a debate below over whether Oshlak was enabled? No. What the board found was even if it's enabled for its own purposes, it doesn't teach this correlation, right? That's exactly right, Your Honor. That's exactly right. On these questions, there are two issues in this case. One is whether the claim dissolution profiles are disclosed in the Oshlak reference, and then, secondly, on the multiple peaks, and that is whether the claim multiple peaks are inherent to oxymorphone compositions. Both of these are fact questions that were subject to an extensive record during the IPR trial. The board's factual determinations on these issues are supported by, in the board's own words, abundant scientific evidence. That's at A26. Simply put, in this case, Amnio failed to carry its burden. With respect to the dissolution elements of the claims, the board's finding that Oshlak does not disclose the claim dissolution limitations was supported by expert testimony from Professor Diane Burgess, who's a renowned dissolution expert at the University of Connecticut School of Pharmacy. She's conducted dissolution research for upwards of 30 years. Her declaration is at A3803 to 3830. It's supported by pharmaceutical textbooks, scientific papers. Those are at A2658 to 2813. All of these show that the paddle method at 50 RPM and the basket method at 100 are not roughly equivalent. The only evidence that Amnio put forward was this handbook on dissolution. The handbook on dissolution said that the basket and the paddle methods are roughly equivalent. But there was no citation, there was no support for that.  Again, based on abundant scientific evidence, the evidence that we, ENDO, put into the case. There's not an overlap or a correlation between the two different methods. With respect to Amnio's arguments on appeal about the burden, the burden of persuasion and the burden shifting, I refer to the July 2016 case Magnum Oil Tools that essentially holds that this burden shifting notion onto the patent owner has no place in an IPR. The citation there is 829 F3, 1364. You've seen also, your honors, in Amnio's briefing that the paddle and the basket are the same test simply because they're expressed in different units. And this is, as the board found, this is scientifically wrong. And this is not a case where ENDO claimed, let's say, one inch when the prior art taught 2.54 centimeters. Between English and metric units, there is an established correlation. That is completely inapplicable to this situation between basket and paddle because the evidence here shows that there's no correlation between the dissolution profiles. Do you concede, as does the director, that because in light of synopsis, that the gelling agent claims are still fair game for attack in some other form? No estoppel as to those gelling agent claims? On the estoppel question, we think that Amnio improperly raised those on appeal. But also, the estoppel question, we feel, belongs in the district court. There is a district court case, and it's up on appeal. And in fact, ENDO filed a motion. So you're disagreeing with what the PTO director says with respect to what 315E means as it relates to claims that have not been instituted? On that topic, on that issue, our primary position is that it's an issue for the district court. But if it is considered in this proceeding, we think, as we briefed, that you could take into consideration the overlapping of the prior art related to 72 to 82 in some of the claim language. But again, our primary position is that it's better left for the district court and it's not part of these proceedings. Anything further? No. If there are no further questions, I'm prepared to submit on the briefs. Thank you, counsel. Ms. Jolie has some rebuttal time. First of all, in response to the earlier question, in the appendix at 95, and again in the appendix at 126, are where the petition cites to the CalCases recitation of the file history declaration where the ENDO submitted that it appeared that extended release formulations of oxymorphone, not limited to formulations with any specific excipient, caused multiple peaks in oxymorphone blood concentration. And the court in Cal relied on that file history statement. So under both the doctrines of judicial estoppel and prosecution history estoppel, ENDO shouldn't even be allowed to dispute that multiple peaks would be inherent to the controlled release formulations of the prior art such as taught by Oshlak. To address opposing counsel's statement earlier about the burden-shifting argument, we don't dispute that under statute, Amnil bears the burden of persuasion and the burden to prove a proposition of unpatentability by a preponderance of the evidence. However, even in the litigation context, as well as in the examination context, it has always been the law that the burden of production shifts after a prima facie case of obviousness has been established. And the Novo Nordisk case cited in the briefing discusses that. And the Magnum case that counsel referred to did not say differently, did not deal with the shifting burden of production, and it also did not have in that case at issue a functional limitation at the alleged point of novelty, which is exactly what is at issue here and which longstanding precedent like the Schreiber and the Swinehart cases indicate once that prima facie case of obviousness has been established based on structural similarity in the prior art, the burden should shift to the patent applicant or patentee to establish that the functional limitation they are claiming would not actually be in that prior art. And ENDO has never done that. In fact, what they argued on the agreement. Do you have anything else? I think that's a misstatement of the law. But go ahead and make your next argument. And ENDO has never done that. And even if it were our burden, again, here the only thing at most we would have to show is that those ranges would potentially overlap at least slightly, and that is not a fact finding that the PTAB made. The only fact finding that they made was that these two measurement methods are not necessarily always exactly equivalent. But that does not answer the question of whether there would be overlap or does not answer the question of whether one of skill in the art would reasonably expect them to be similar and therefore have a reasonable expectation of success of getting subject matter simply by varying or by aiming for dissolution still within the range claimed, the percentage range claimed by OSHLAC that's simply measured by one of the alternate USP-approved measurement methods. With that, I will submit my case. Thank you, Ms. Drulli. We'll take the case under advisement.